UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ALAN BARTH,<br><br>Plaintiff,<br><br>vs.<br><br>ACV AUCTIONS INC., RENE F. JONES, GEORGE CHAMOUN, KIRSTEN CASTILLO, ROBERT P. GOODMAN, BRIAN HIRSCH, EILEEN A. KAMERICK, BRIAN RADECKI<br><br>Defendants. | Case No. 26-cv-11520 |

**COMPLAINT**

Plaintiff Alan Barth ("Plaintiff"), by and through his attorneys, alleges the following upon information and belief, including investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

## NATURE OF THE ACTION

1. This is an action brought by Plaintiff against ACV Auctions Inc. ("ACV" or the "Company"), the members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with ACV, the "ACV Defendants") for their violations of Sections 14(d)(4) and 14(e) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(d)(4), 78n(e), 78t(a), respectively, and United States Securities and Exchange Commission ("SEC") Rule 14d-9, 17 C.F.R. §240.14d-9 ("Rule 14d-9"). Plaintiff's claims arise in connection with the proposed tender offer ("Tender Offer") by Copart, Inc.'s

("Copart") wholly controlled subsidiary Apple Merger Sub, Inc. ("Merger Sub."), an entity formed for the sole purpose of facilitating the acquisition of ACV by Copart (together with Copart and Merger Sub., "Copart"), to acquire all of the issued and outstanding shares of ACV (the "Proposed Transaction").

2. On or about September 10, 2026, ACV and Copart entered into an agreement and plan of merger, (the "Merger Agreement"), whereby stockholders of ACV common stock will receive $10.50 in cash for each share of ACV common stock they own (the "Offer Price" or "Merger Consideration").

3. On or about September 17, 2026, in order to convince ACV's stockholders to tender their shares, ACV and the Board authorized the filing of a materially incomplete and misleading Schedule TO-T Tender Offer Statement (the "Tender Offer Statement") and Schedule 14D-9 Solicitation/Recommendation Statement (the "Recommendation Statement"), respectively, with the SEC, which contains materially incomplete and misleading information.

4. The Tender Offer is scheduled to expire one minute after 11:59 p.m., Eastern Time, on September 30, 2026, (the "Expiration Date") and, upon information and belief, ACV's public stockholders have already begun to tender their stock based on the incomplete and misleading information in the Recommendation Statement. It is imperative that the Tender Offer Statement and Recommendation Statement be corrected immediately so public stockholders may make an informed determination on whether to tender their shares.

5. For these reasons, and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from closing the Tender Offer or taking any steps to consummate the Proposed Transaction, unless and until the material information discussed below is disclosed to ACV's stockholders, or, in the event the Proposed Transaction is consummated, to recover damages

resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391 as Plaintiff allege violations of Sections 14(d)(4) and 14(e) of the Exchange Act.

7. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each defendant by this Court permissible under the traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Vigman*, 764 F.2d at 1316.

8. Venue is proper in this Court under Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b)(2) because Defendants are subject to personal jurisdiction in this District. ACV's financial advisor maintains offices in this District, and shareholders of ACV reside in this District so Defendants were aware that the Recommendation Statement would be reviewed in this District. *Santore v. Swaminathan*, No. 17 cv 5742, 2018 U.S. Dist. LEXIS 33352, at *23 (N.D. Ill. Mar. 1, 2018) ("the standard for establishing venue under [the Exchange Act] is not a rigorous one") (quoting *Haskett v. Reliv' Int'l.*, No 94 c 1461, 1994 U.S. Dist. LEXIS 5678, at *6 (N.D. Ill. Apr. 29, 1994)); *see also City of Miami Gen. Emples. & Sanitation Emples. Ret.*

*Trust v. Casey*, No. 22-cv-2371, 2023 U.S. Dist. LEXIS 239991, at *4 (S.D. Ohio Mar. 27, 2023) ("The rule for establishing venue under the Securities Exchange Act is more permissive than under 28 U.S.C. § 1391, consistent with the intent of the venue and jurisdiction provision in the securities laws 'to grant potential plaintiffs liberal choice in their selection of a forum.'") (quoting *Wayne Cnty. Emples.' Ret. Sys. v. MIC Inv. Corp.*, 604 F. Supp. 2d 969, 973 (E.D. Mich. 2009)). Further, Defendants were aware that the Tender Offer Statement and/or the Recommendation Statement would be reviewed in this District. *See Sarantakis v. Gruttadauria*, No. 02 c 1609, 2003 U.S. Dist. LEXIS 4002, at *23 (N.D. Ill. Mar. 17, 2003) ("Venue is appropriate in a securities case where a defendant causes false or misleading information to be transmitted into a judicial district."); *see also Oxford First Corp. v. PNC Liquidating Corp.*, 372 F. Supp. 191, 197 (E.D. Pa. Mar. 6, 1974) ("Venue will be sustained in a securities case where a defendant causes false or misleading information to be transmitted into a judicial district, even if the defendant never has been physically present in that district."); *Mitchell v. Texas Gulf Sulphur Co.*, 446 F.2d 90, 106 (10th Cir. 1971) (finding venue proper in the District of Utah where the defendant released a false and fraudulent press statement that was printed in the Wall Street Journal and was read and relied upon by the plaintiff in Salt Lake City, Utah).

## **PARTIES**

9. Plaintiff is, and has continuously throughout all times relevant hereto, been the owner of ACV common stock.

10. Defendant ACV is a Delaware corporation that provides a digital marketplace for sourcing selling, and managing used vehicles. The Company's common stock trades on the New York Stock Exchange (the "NYSE") under the ticker symbol "ACVA"

11. Defendant Rene F. Jones ("Jones") is, and has been at all relevant times, the Chair

of the Board of Directors of the Company.

12. Defendant George Chamoun ("Chamoun") is, and has been at all relevant times, the CEO and a director of the Company.

13. Defendant Kirsten Castillo ("Castillo") is, and has been at all relevant times, a director of the Company

14. Defendant Robert P. Goodman, ("Goodman") is, and has been at all relevant times, a director of the Company.

15. Defendant Brian Hirsch, ("Hirsch") is, and has been at all relevant times, a director of the Company.

16. Defendant Eileen A. Kamerick ("Kamerick") is, and has been at all relevant times, a director of the Company.

17. Defendant Brian Radecki ("Radecki") is, and has been at all relevant times, a director of the Company.

18. The defendants identified in ¶¶ 11-17 are collectively referred to as the "Individual Defendants" or the "Board."

## SUBSTANTIVE ALLEGATIONS

### A. Background on the Transaction

19. On May 29, 2026, Jeffrey Liaw, the former CEO of Copart, contacted Defendant Chamoun and thereafter Copart's expressed interest in a potential transaction with the Company.

20. On June 9, 2026, the Company and Copart executed a confidentiality agreement.

21. On July 2, 2026, Copart sent a proposal to acquire the Company for $8.00 to $8.50 per share (the "July 2 Proposal"). On July 12, 2026, the Company's instructed its financial advisor, J.P. Morgan Securities LLC ("JPM"), to contact other potential strategic parties for a

transaction.

22. On July 14, 2026, JPM contacted "Party A," and "Party B."

23. On August 3, 2026, JPM provided a relationships disclosure memorandum to the Company representing that JPM had no material interests or conflicts with any of the parties involved in the merger process.

24. On August 6, 2026, Party A, Party B, and Copart delivered proposals to the Company. Party A proposed a transaction with an implied value per share of $10.50. Party B proposed a transaction with an implied price per share of between $11.00 to $12.00. Finally, Copart proposed an all-cash transaction with a price per share of between $10.00 and $10.25 per share.

25. On August 8, 2026, JPM and the Board reviewed each proposal, and instructed JPM to seek improved offers.

26. Thereafter Party B declined to further pursue a strategic transaction, and the Company's legal counsel circulated a draft of the merger agreement to Party A and Copart.

27. Party A and Copart provided markups of the merger agreement during early September 2026.

28. Additionally, on September 6, 2026, Copart sent a revised proposal to acquire the Company for $10.50 per share.

29. On September 8, 2026, Party A revised its proposal to acquire the Company for $10.00 per share.

30. The following day, September 9, 2026, JPM requested that Party A improve its proposal. Party A did not respond to this request and stopped further communications..

31. Further, on September 9, 2026, JPM provided an updated relationship disclosure

letter to the Board regarding their commercial relationships with both the Company and Copart.

32. On September 10, 2026, the Company and Copart executed the Merger Agreement.

## B. The Proposed Transaction

33. On September 10, 2026, ACV and Copart issued a joint press to announce the Proposed Transaction, which stated, in relevant part, as follows:

> **Copart to Acquire ACV, Expanding Position Across the Vehicle Remarketing Ecosystem**
>
> - ***Combination creates a full-spectrum, digital vehicle remarketing platform spanning dealer trade-ins, wholesale remarketing, salvage disposition, and international resale***
> - ***Provides an immediate, scaled position in the dealer-to-dealer vehicle auction channel and expanded volume with attractive commercial opportunities across the combined portfolio***
> - ***Strengthens technology capabilities with ACV's differentiated dealer-focused vehicle-data tools***
> - ***Transaction expected to accelerate revenue growth and be accretive to Copart EPS in fiscal 2028 and beyond***
> - ***Copart to host conference call at 5:30 p.m. Eastern Time today***
>
> DALLAS & BUFFALO, N.Y.--(BUSINESS WIRE)-- Copart, Inc. (NASDAQ: CPRT), a global leader in online vehicle auctions, and ACV (NYSE: ACVA), a leading digital automotive marketplace and data services partner for dealers and commercial clients, today announced a definitive agreement under which Copart will acquire all outstanding shares of ACV common stock for $10.50 per share in cash, representing an implied equity value of approximately $1.9 billion. The per-share purchase price represents a premium of approximately 45% to ACV's unaffected closing stock price on August 10, 2026 (the last trading day prior to published media reports regarding a potential transaction involving ACV) and a premium of approximately 41% to ACV's 30-day volume-weighted average price for the period ending September 9, 2026/.

**Transaction Details**

> Under the terms of the definitive merger agreement, Copart, through a subsidiary, will promptly commence a tender offer to acquire all outstanding shares of ACV common stock for $10.50 per share in cash. The consummation of the tender offer is subject to the tender of at least a majority of the outstanding shares of ACV common stock, the expiration or termination of the waiting period under the Hart-

> Scott-Rodino Antitrust Improvements Act of 1976, and other customary conditions. Following the successful completion of the tender offer, a subsidiary of Copart will merge with ACV, and any remaining shares of ACV common stock not tendered will be cancelled and converted into the right to receive the same $10.50 per share in cash paid in the tender offer.
>
> Copart intends to fund the transaction through cash on hand, maintaining sufficient balance sheet flexibility to continue pursuing organic and inorganic investments. The transaction is not subject to any financing condition.
>
> The boards of directors of both companies have unanimously approved the transaction, which is expected to close by calendar year-end 2026.
>
> Following the close of the transaction, ACV will operate as an independent subsidiary of Copart led by ACV's existing leadership team.

**Advisors**

> Evercore is serving as financial advisor to Copart, Wilson Sonsini Goodrich & Rosati, Professional Corporation is serving as legal counsel, and FGS Global is serving as strategic communications advisor.
>
> J.P. Morgan Securities LLC is serving as exclusive financial advisor and provided a fairness opinion to ACV, Davis Polk & Wardwell LLP is serving as legal counsel, and Joele Frank, Wilkinson Brimmer Katcher is serving as strategic communications advisor

**C. <u>The Preclusive Deal Protection Devices</u>**

34. The Merger Agreement contains onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and all but ensure that the Proposed Transaction is consummated and that no competing offers emerge for the Company.

35. The Merger Agreement provides for a termination fee payable to Parent by the Company in the event the transaction is not consummated in the amount of $57,700,000 million.

36. Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that the Company's stockholders will continue to suffer absent judicial intervention.

## D. The SEC Filings Are Incomplete and Misleading

37. On or about September 17, 2026 the Board and Parent authorized the filing of the materially incomplete and misleading Tender Offer Statement and Recommendation Statement with the SEC.

38. Specifically, the Recommendation Statement is materially incomplete and misleading with respect to (i) its failure to disclose all of financial services that JPM provided in the last two years to Copart; (ii) the material terms of "significant" issues discussed between the Company and Copart prior to the signing of the Merger Agreement; and (iii) the quarterly intraday high and lows for the last two financial quarters.

### i. The Recommendation Statement is Materially Misleading and Incomplete with Respect to the financial services that JPM provided in the last two years

39. The Recommendation Statement is materially incomplete and misleading as to all of the financial services that JPM provided to Copart in the last two years and whether the Company's Board was aware of all of these advising services during the negotiations of the Proposed Transaction.

40. JPM's fairness opinion discloses the financial and advising services that they provided to both the Company and Copart in the preceding two years:

> During the two years preceding the date of its opinion, neither J.P. Morgan nor its affiliates have had any material financial advisory or other material commercial or investment banking relationships with Parent. During the two years preceding the date of its opinion, J.P. Morgan and its affiliates have had commercial or investment banking relationships with the Company, for which J.P. Morgan and such affiliates received customary compensation. Such services during such period have included acting as sole bookrunner on a credit facility of the Company in June 2025. In addition, J.P. Morgan's commercial banking affiliate is an agent bank and lender under outstanding credit facilities of the Company. During the two-year period preceding the delivery of J.P. Morgan's opinion, the aggregate fees received by J.P. Morgan from the Company were approximately $700,000. In addition, J.P. Morgan and its affiliates hold, on a proprietary basis, less than 1% of the outstanding common stock of each of the Company and Parent. In the ordinary course of their businesses, J.P. Morgan and its affiliates may actively trade the debt and equity securities or financial instruments (including derivatives, bank loans or other obligations) of the Company or Parent for their own accounts or for the accounts of customers and, accordingly, they may at any time hold long or short positions in such securities or other financial instruments.

Recommendation Statement at 30

41. Notwithstanding JPM's representation that "J.P. Morgan nor its affiliates have had any material financial advisory or other material commercial or investment banking relationships

with Parent [Copart]," a Senior Revolving Credit Agreement dated as of January 23, 2026 valued at $1,250,000,000 expressly identifies "JPMORGAN CHASE BANK, N.A." as a "Lender":

JPMORGAN CHASE BANK, N.A.,
as a Lender

By: /s/ Marlon Mathews
Name: Marlon Mathews
Title: Executive Director

U.K. Revenue & Customs Double Taxation Treaty Passport Scheme Reference No: 13/M/0268710/DTTP

Jurisdiction of tax residence: USA

SENIOR REVOLVING CREDIT AGREEMENT – Signature Page

https://www.sec.gov/Archives/edgar/data/900075/000119312526022730/d64083dex101.htm (last accessed 9/21/2026)

42. As such, the Recommendation Statement fails to identify the Senior Revolving Credit Agreement in which JPMorgan Chase Bank, N.A. served as one of the lenders. The omission of the JPM's involved in the January 23, 2026 Senior Revolving Credit Agreement materially understates the nature, magnitude, and continuity of JPM's relationship with Copart.

43. Further, JPM explicitly disclosed to the Company that JPM possessed no material interests or conflicts in connection with Copart:

> On August 3, 2026, J.P. Morgan provided a customary relationships disclosure memorandum covering Party A, Copart and Party B to Company management, the Company Board and Davis Polk demonstrating that J.P. Morgan had no material interests or conflicts in connection with the Company, any of its directors or officers, or any of Party A, Copart or Party B.

Recommendation Statement at 18

44. Such information concerning JPM's role as a lender in Copart's January 2026 Senior Revolving Credit Agreement is by no means immaterial. JPM's role as a lender, and the amount of JPM's commitment, outstanding exposure, fees received or receivable, and anticipated interest or other financial benefits, bears directly on JPM's independence and incentive in recommending the Proposed Transaction, especially as a large portion of JPM's fee depends on

the consummation of the Proposed Transaction. JPM's fairness opinion indicates that, apart from the $4.0 million it has received for delivering the fairness opinion, roughly $22.0 million remains entirely contingent on the consummation of the Proposed Transaction. Recommendation Statement at 30.

45. Further, without disclosure of JPM's individual commitment, exposure, compensation, and anticipated financial benefits under the Copart credit facility—and whether those matters were disclosed to and considered by the Board—shareholders cannot independently evaluate the adequacy of the Board's conflict review or the objectivity of the financial advice supporting the Board's recommendation.

**ii. The Recommendation Statement is Materially Misleading and Incomplete with Respect to the nature of the "significant" material terms that were resolved on September 8, 2026**

46. The Recommendation Statement indicates that the respective legal counsel for the Company and Copart engaged in extensive negotiations while negotiating early drafts of the merger agreement:

> On September 1, 2026, Wilson Sonsini sent a further markup of the merger agreement to Davis Polk. Among other points that were negotiated, the parties negotiated (1) the regulatory efforts covenant, (2) the triggers and tail for the payment of the Company termination fee, (3) the amounts of the Company termination fee and the reverse termination fee, (4) the representations and warranties and (5) the interim operating covenants.

Recommendation Statement at 17

47. Only a few days later, and just two days prior to the signing of the Merger Agreement, "On September 8, 2026, Davis Polk and Wilson Sonsini spoke by phone to resolve a number of significant open issues on the merger agreement." Recommendation Statement at 18.

48. The Recommendation Statement fails to disclose what "significant open issues" were resolved during these discussions.

49. As such, the issues as of September 8, 2026 are characterized as "significant," but the Recommendation Statement does not identify those issues or disclose whether they concerned the regulatory-efforts covenant, termination-fee protections, restrictions on competing proposals, interim operating restrictions, closing conditions, or matters identified during Copart's diligence. Without that information, shareholders cannot determine whether resolution of those issues affected the consideration, the likelihood of consummation, the Company's ability to pursue a superior proposal, or the risks imposed on the Company if the transaction fails.

**iii. The Recommendation Statement is Materially Misleading and Incomplete with Respect to the Quarterly High and Low Trading Price for the last two years**

50. The Recommendation Statement is materially misleading and incomplete as it fails to accurately disclose the intraday high and low prices for each financial quarter in the preceding two years.

51. 17 C.F.R. § 240.14d-3 states, in part:

> (a) Filing and transmittal. No bidder shall make a tender offer if, after consummation thereof, such bidder would be the beneficial owner of more than 5 percent of the class of the subject company's securities for which the tender offer is made, unless as soon as practicable on the date of the commencement of the tender offer such bidder:
>
> (1) Files with the Commission a Tender Offer Statement on Schedule TO (§ 240.14d-100), including all exhibits thereto;
>
> (2) Delivers a copy of such Schedule TO, including all exhibits thereto:
>
> (i) To the subject company at its principal executive office[.]

52. Item 2 of 17 C.F.R. § 240.14d-100 requires that the Tender Offer Statement "furnish the information required by Item 1002(a) through (c) of Regulation M-A," found at 17 C.F.R. § 229.1002.

53. 17 C.F.R. § 229.1002(c) requires that the Tender Offer Statement "[i]dentify the principal market in which the subject securities are traded and state the high and low sales prices for the subject securities in the principal market … *for each quarter* during the past two years." (emphasis added).

54. The Offer to Purchase indicated that the High and Low Trading Prices for the Company during each quarter for the fiscal years of 2024, 2025, and three quarters for fiscal 2026:

According to ACV's Annual Report on Form 10-K for the year ended December 31, 2025, the Shares are listed and principally traded on NYSE under the symbol "ACVA." The following table sets forth the high and low closing sale prices per Share on NYSE with respect to the periods indicated and as reported by published financial sources:

| | High | Low |
|---|---|---|
| **2024** | | |
| First Quarter | $19.19 | $18.72 |
| Second Quarter | $18.44 | $18.05 |
| Third Quarter | $20.51 | $19.93 |
| Fourth Quarter | $22.17 | $21.32 |
| **2025** | | |
| First Quarter | $14.11 | $13.49 |
| Second Quarter | $16.53 | $16.03 |
| Third Quarter | $ 9.97 | $ 9.56 |
| Fourth Quarter | $ 8.16 | $ 8.02 |

24

| | High | Low |
|---|---|---|
| **2026** | | |
| First Quarter | $ 4.39 | $ 4.16 |
| Second Quarter | $ 7.34 | $ 7.05 |
| Third Quarter (through September 16, 2026) | $10.46 | $ 6.60 |

Offer to Purchase at 24

55. Reviewing the Company's trading history, it appears the figures in the table above represent the intraday high and low prices on the ***last day*** of each quarter rather than the intraday high and low prices ***throughout*** each quarter.

56. For example, for the first quarter of fiscal 2024, Yahoo Finance represents that the intraday high and low prices throughout the entire quarter were $19.54 and $12.84, respectively. In contrast, the Offer to Purchase represents the intraday high and low prices as to March 28, 2024, or the last day of the first quarter of fiscal 2024, alone. https://finance.yahoo.com/quote/ACVA/history/?period1=1704067200&period2=1711843200.

(last accessed 9/21/2026). Similarly, for the fourth quarter of fiscal 2025, for example, Yahoo Finance represents that the intraday high and low prices throughout the entire quarter were $10.41 and $4.95, respectively. However, the Offer to Purchase represents the intraday high and low prices as to December 31, 2025 alone. https://finance.yahoo.com/quote/ACVA/history/?period1=1704067200&period2=1767139200 (last accessed 9/21/2026).

57. As such, the correct table accounting for the intraday high and low throughout the entire relevant quarter should be as follows[1]:

| Period | High | Low |
|---|---|---|
| Q1 2024 | $19.54 | $12.84 |
| Q2 2024 | $19.62 | $15.44 |
| Q3 2024 | $21.10 | $14.76 |
| Q4 2024 | $23.46 | $16.85 |
| Q1 2025 | $22.47 | $12.77 |
| Q2 2025 | $17.54 | $11.88 |
| Q3 2025 | $16.83 | $9.56 |
| Q4 2025 | $10.41 | $4.95 |
| Q1 2026 | $9.07 | $4.07 |
| Q2 2026 | $7.34 | $4.07 |
| Q3 2026 through Sept. 16 | $10.46 | $6.60 |

[1] Data was retrieved from Yahoo Finance (https://finance.yahoo.com/quote/ACVA/history/ (last accessed 9/21/2026)) and Investing.com (https://www.investing.com/equities/acv-auctions-historical-data (last accessed 9/21/2026))

58. The SEC requires the full and fair disclosure of accurate historical trading price information because such information "could be viewed as '*per se* material or 'presumptively material' to investors" deciding whether or not to support the transaction that is being proposed. *See, e.g.,* George S. Georgiev, *Too Big to Disclose: Firm Size and Materiality Blindspots in Securities Regulation*, 64 UCLA L. Rev. 602, 619 n.83 (2017); *cf. In re WorldCom, Inc. Sec. Litig.*, 303 F. Supp. 2d 385, 389-90 (S.D.N.Y. 2004) (finding plaintiff failed to state a claim because they "failed to allege that the historical stock prices were falsely described").

59. One reason underlying the requirement of full and fair disclosure of the high and low sales prices for the securities during each quarter of the past two years is to ensure that investors understand the short-, medium, and longer-term trends in the stock price.

**COUNT I**

**(Against All Defendants for Violation of Section 14(e) of the Exchange Act)**

60. Plaintiff incorporates each and every allegation set forth as if fully set forth herein.

61. Section 14(e) of the Exchange Act provides that it is unlawful "for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading…" 15 U.S.C. §78n(e).

62. Defendants violated § 14(e) of the Exchange Act by issuing the Tender Offer Statement and Recommendation Statement in which they made untrue statements of material facts or failed to state all material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, in connection with the Tender Offer. Defendants knew or recklessly disregarded that the Recommendation Statement

failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

63. Defendants prepared, reviewed, and/or disseminated the Tender Offer Statement and Recommendation Statement. Nonetheless, they misrepresented and/or omitted material facts, including material information about the consideration offered to stockholders via the Tender Offer and the intrinsic value of the Company.

64. In doing so, Defendants made untrue statements and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(e). The Individual Defendants were therefore reckless, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Recommendation Statement, but nonetheless failed to obtain and disclose such information to stockholders although they could have done so without extraordinary effort.

65. The omissions and incomplete and misleading statements in the Tender Offer Statement and Recommendation Statement are material in that a reasonable stockholder would consider them important in deciding whether to tender their shares. In addition, a reasonable investor would view the information identified above which was not fairly and fully disclosed in the Tender Offer Statement and Recommendation Statement as altering the "total mix" of information made available to stockholders.

66. Defendants knowingly or with deliberate recklessness failed to fully and fairly disclose the material information identified above from the Recommendation Statement, causing certain statements therein to be materially incomplete and therefore misleading. Indeed, while

Defendants undoubtedly had access to and/or reviewed the material information in connection with approving the Proposed Transaction, they did not fairly and fully disclose it to the public investors, rendering certain portions of the Tender Offer Statement and Recommendation Statement materially incomplete and therefore misleading.

67. The misrepresentations and omissions in the Tender Offer Statement and Recommendation Statement are material to Plaintiff, and Plaintiff will be deprived of his entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the Expiration Date.

## COUNT II

**(Against all Defendants for Violations of Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9, 17 C.F.R. § 240.14d-9)**

68. Plaintiff incorporates each and every allegation set forth as if fully set forth herein.

69. Defendants have caused the Tender Offer Statement and Recommendation Statement to be issued with the intention of soliciting stockholder support of the Proposed Transaction.

70. Section 14(d)(4) of the Exchange Act and SEC Rules 14d-3 and 14d-9 promulgated thereunder require full and complete disclosure in connection with tender offers. Specifically, Section 14(d)(4) provides that:

> Any solicitation or recommendation to the holders of such a security to accept or reject a tender offer or request or invitation for tenders shall be made in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

71. SEC Rules 14d-3 and 14d-9(d), which was adopted to implement Section 14(d)(4) of the Exchange Act require full and fair disclosure of all material information in connection with any solicitation of stockholders to participate in a tender offer.

72. The omission of information from a recommendation statement will violate Section 14(d)(4) and Rule 14d-9 if other SEC regulations specifically require disclosure of the omitted information.

73. The Recommendation Statement violates Section 14(d)(4) and Rule 14d-9 because it omits material facts, including those set forth above, that render the Recommendation Statement misleadingly incomplete. Defendants knowingly or with deliberate recklessness omitted the material information identified above from the Tender Offer Statement and Recommendation Statement, causing certain statements therein to be materially incomplete and therefore misleading. Indeed, while Defendants undoubtedly had access to and/or reviewed the omitted material information in connection with approving the Proposed Transaction, they allowed it to be misrepresented or omitted from the Tender Offer Statement and Recommendation Statement, rendering them materially incomplete and therefore misleading.

74. The misrepresentations and omissions in the Tender Offer Statement and Recommendation Statement are material to Plaintiff, and Plaintiff will be deprived of the right to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the Expiration Date.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Tender Offer or taking any steps to consummate the Proposed Transaction, until the Company issues curative disclosures that fully address the deficiencies identified herein;

B. Rescinding, to the extent already implemented, the Merger Agreement or any of

the terms thereof, or granting Plaintiff rescissory damages;

C. Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

D. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E. Granting such other and further relief as this Court may deem just and proper

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: September 21, 2026

**ADEMI LLP**

By: */s/ John D. Blythin*
Guri Ademi (WI SBN 1021729)
John D. Blythin (IL ARDC 6281648)
3620 East Layton Avenue
Cudahy, Wisconsin 53110
Tel. 414-482-8000
Fax 414-482-8001
gademi@ademilaw.com
jblythin@ademilaw.com

*Attorneys for Plaintiff*